NOT FOR PUBLICATION                    (Doc. Nos. 714, 715, 716, 717, 718,
                                                    719, 720, 721)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |  |
|---|---|---|
| _____ | : | |
| IN RE PAULSBORO | : | Master Docket No. 13-784 (RBK/KMW) |
| DERAILMENT CASES | : | |
| | : | |
| | : | 12-7468 (Breeman) |
| | : | (Doc. Nos. 140, 141) |
| | : | |
| | : | 12-7747 (Lord) |
| | : | (Doc. Nos. 136, 137) |
| | : | |
| | : | 13-3350 (Everingham) |
| | : | (Doc. Nos. 97, 98) |
| | : | |
| | : | 13-3244 (Morris) |
| | : | (Doc. Nos. 91, 92) |
| | : | |
| | : | 13-4569 (Johnson) |
| | : | (Doc. Nos. 93, 94) |
| | : | |
| | : | 13-5763 (Truluck) |
| | : | (Doc. Nos. 112, 113) |
| | : | |
| | : | 13-7410 (Smith) |
| | : | (Doc. Nos. 78, 79) |
| | : | |
| | : | |
| | : | **OPINION** |
| _____ | : | |

**KUGLER**, United States District Judge:

    This matter stems from the derailment of a train carrying toxic cargo, causing a release of

chemicals into the water and air, in Paulsboro, New Jersey.  Presently before the Court are the

Motions of Defendant CSX Transportation, Inc. ("CSX"), and the Motion of Defendant Norfolk

Southern Railway Company ("Norfolk Southern") (collectively "Defendants") for Summary

Judgment pursuant to Fed. R. Civ. P. 56 as to Plaintiffs Alice Breeman, Savanna Breeman-Rodgers, Ryan Ragone, Michelle Truluck, Abdeslam Sahla, Bryan Everingham, Robert Van Fossen, Marlo Johnson, Zena Custis, Ronald Morris, and Kristen Pickel[1] (collectively "Plaintiffs").[2]  The basis for Defendants' motions is that neither CSX nor Norfolk Southern can be liable to Plaintiffs because they did not own or operate the train that derailed or the bridge that the train was crossing over when it derailed, nor did they employ the crew on board the train. For the reasons expressed herein, Defendants' motions are **GRANTED**.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The basic facts of this case have been set forth in numerous Opinions issued by the Court over the past nearly three years of litigation.  The Court will thus limit the discussion of facts to those material to this particular dispute.

On November 30, 2012, a train derailed while crossing the Paulsboro Moveable Bridge (the "Paulsboro Bridge"), a "swing bridge" which can be positioned either to permit water traffic to travel along the Mantua Creek or rail traffic to pass over the Mantua Creek.  When the train derailed, a car carrying vinyl chloride was breached, resulting in the release of over 20,000 gallons of the chemical.  The Paulsboro Bridge is located on the Penns Grove Secondary Line. (Civ. No. 13-3244, CSX's Statement of Material Facts Not in Dispute ("SMF") ¶ 2.)[3]  At the time of the derailment, Defendant Consolidated Rail Corporation ("Conrail") owned, maintained,

---

[1] The Court has granted summary judgment in favor of Defendants as to Ragone, Everingham, and Johnson in an Opinion and Order also issued on this date.  Thus, these Plaintiffs are no longer active parties to this litigation and the Court need not address Defendants' motions as to these Plaintiffs.

[2] CSX has filed seven separate motions as to the nine Plaintiffs, and Norfolk Southern has filed one motion as to all nine plaintiffs.  Due to the similarity of issues, the Court will address the motions in this single Opinion.

[3] All references to the record refer to materials submitted in support of or in opposition to CSX's motion for summary judgment in Morris v. Consolidated Rail Corp., 13-3244 (Master Docket 13-784, Doc. No. 721), unless otherwise noted.  The Court notes that CSX's SMFs submitted in support of the seven separate motions are all identical except as to the last paragraph, and that Plaintiffs have submitted a single Certification of Joseph Alan Venti with attached exhibits in opposition to all motions.  Norfolk Southern's SMF is substantially similar to CSX's.

operated, and paid the property insurance for the Paulsboro Bridge.  (Id. ¶ 3.)  Plaintiffs do not

dispute this fact, but contend that Conrail did not operate the Paulsboro Bridge independent of

CSX and Norfolk Southern.  (Pls.' Resp. to CSX's SMF ¶ 3; Ex. A. to Certification of Joseph

Alan Venti ("Venti Cert."), Deposition of Allen Richter ("Richter Dep.") 48:5-8 ("We have

basically become an extension of CSX and [Norfolk Southern], almost like one of their divisions

depending on who it – which railroad it is."); Ex. D to Venti Cert., Surface Transportation Board

("STB") Decision No. 89, 3 S.T.B. 196, 1998 WL 456510 (July 20, 1998) ("STB Decision No.

89").)  Conrail was also operating the train that derailed at the time of the incident, and it

employed the train's conductor, Wilbert Den Ouden, its engineer, Mark Mather, and the

dispatcher, Jon Havlicek.  (CSX's SMF ¶¶ 4-6.)

        Conrail is a Pennsylvania corporation that does business as its own distinct legal entity,

functioning as a switching and terminal railroad company.  (Id. ¶ 20.)  Conrail was formed by

federal law and began operations on April 1, 1976.  (Id. ¶¶ 8-9.)  Through a series of transactions

that took place in 1996 and 1997, the parent companies of CSX and Norfolk Southern acquired

100% of Conrail, Inc.'s common stock.  (Id. ¶ 10.)  Conrail is a wholly owned subsidiary of

Conrail, Inc.  (Id.)  As a result of the transactions, CSX and Norfolk Southern each hold a 50%

voting interest in Conrail, with the former holding a 42% equity interest in Conrail, and the latter

holding a 58% equity interest.  (STB Decision No. 89, 1998 WL 456510, at *7.)

        The parties entered into a Transaction Agreement on June 10, 1997, which provided for

the division among them of certain Conrail assets, with a closing date of June 1, 1999.  (CSX's

SMF ¶ 11.)  On the closing date, Conrail allocated portions of its real property and operating

assets to two Conrail wholly-owned subsidiaries, Pennsylvania Lines, LLC ("PRR") and New

York Central Lines, LLC ("NYC").  (Id. ¶ 12.)  Also on that date, Norfolk Southern began

operating the Conrail assets allocated to PRR, and CSX began operating those Conrail assets allocated to NYC.  (Id.)  Pursuant to the Transaction Agreement, Conrail retained a portion of its real property and operating assets.  (Id. ¶ 13.)  However, Plaintiffs assert that Conrail's "retained assets" were nothing but assets in "Shared Asset Areas," subject to the control of either Norfolk Southern or CSX.  (Pls.' Resp. to CSX's SMF ¶ 13.)  The Penns Grove Secondary Line, as well as the Paulsboro Bridge, are part of the retained assets owned by Conrail.  (Norfolk Southern's SMF ¶ 24.)  In 2004, Norfolk Southern and CSX directly acquired the real property and operating assets that were the subject of the Operating Agreements with PRR and NYC.  (CSX's SMF ¶ 18.)

As part of the Transaction Agreement, Conrail retained liabilities not relating to the PRR or NYC-allocated assets, and responsibility for certain liabilities arising prior to the date the Transaction Agreement became effective.  (Id. ¶ 15.)  The parties agree that Conrail pays for claims arising out of negligence by Conrail employees, incidents occurring on Conrail retained assets property, or incidents arising out of Conrail operations, if liability is established (id. ¶ 16); however, Plaintiffs contend that Conrail is not ultimately financially responsible for any liabilities, and that CSX and/or Norfolk Southern are.  (Pl.'s Resp. to CSX's SMF ¶¶ 15, 17.)

Some of Conrail's general and administrative functions are provided through service provider agreements between Conrail and Norfolk Southern and between Conrail and CSX, for which Conrail pays a fee to those companies.  (CSX's SMF ¶ 23.)  On the other hand, Norfolk Southern and CSX pay a fee to Conrail for switching and terminal services that Conrail provides to them.  (Id. ¶ 24.)  Such switching and terminal services were being provided by Conrail at the time of the derailment.  (Id.)

It appears that the parties' main dispute is whether Conrail owns and operates its retained assets and essentially functions separate and apart from Norfolk Southern and/or CSX.  While Conrail's Chief Legal Officer, Jonathan Broder, states that it does, (Broder Affidavit ¶¶ 12-14), Plaintiffs argue otherwise.  They cite to an STB Decision that says "Effective on June 1, 1999 . . . , the assets of Conrail were taken over by, and divided between, CSX and [Norfolk Southern]." (Ex. E to Venti Cert., STB Decision No. 17, 2004 WL 2619768, at *3 (Oct. 20, 2004) ("STB Decision No. 17").)  Though the parties agree that Conrail's financial accounts are separate from those of Norfolk Southern and CSX, (CSX's SMF ¶ 21), Plaintiffs dispute Defendants' averment that in 2012, 2013, and 2014, Conrail had assets totaling $1,507,925,000, $1,545,906,000, and $1,669,095,000, respectively, by pointing to this same statement in STB Decision No. 17.  (Pls.' Resp. to CSX's SMF ¶ 21.)  STB Decision No. 17 also states that Conrail's rail operating properties were divided into "Allocated Assets," to be operated either by CSX or Norfolk Southern alone, and "Retained Assets," which would be "retained and operated by a newly constituted Conrail."  (2004 WL 2619768, at *3.)

Plaintiffs also rely on STB Decision No. 89, which states the intent that, following the division, Conrail "will not hold itself out to the public as performing transportation services directly and for its own account," it "will not enter into any contract (other than with CSX[] or [Norfolk Southern]) for the performance of transportation services," and that all such services it performs "will be performed as agent or subcontractor of CSX[] or [Norfolk Southern]."  (1998 WL 456510, at *17.)  Thus, while Defendants contend that Conrail signs its own contracts, Plaintiffs assert that Conrail only signs contracts with CSX or Norfolk Southern.  (CSX's SMF ¶ 21; Pl.'s Resp. to CSX's SMF ¶ 21.)

CSX and Norfolk Southern filed the instant motions, arguing that, at the time of the derailment, they did not own or operate the Paulsboro Bridge or the train that derailed, nor did they employ the engineer, conductor, or dispatcher involved, and therefore there is no basis for liability.  Generally, the Plaintiffs' Complaints do not allege facts relating to any specific negligence on the part of CSX or Norfolk Southern.  Rather, the Complaints identify the citizenship of these parties as well as Conrail, and thereafter refer to "defendants," who allegedly "jointly and severally owned, maintained, operated, managed and controlled" the Paulsboro Bridge and the freight train that derailed while attempting to cross said bridge.  (Morris Compl. ¶¶ 11-12; see also, e.g., Van Fossen Compl. ¶¶ 18-23, 28; Breeman First Am. Compl. ¶¶ 9-14; Custis Third Am. Compl. ¶¶ 43-48; Truluck Second Am. Compl. ¶ 41.)[4]

Plaintiffs allege that the Paulsboro Bridge "had malfunctioned numerous times in the years prior to November 30, 2012, and the Defendants were aware that the swing bridge had, in the past, failed to properly connect and lock to [sic] as to permit train traffic to proceed safely over the bridge."  (Van Fossen Compl. ¶ 30; see also Morris Compl. ¶ 16; Custis Third Am. Compl. ¶¶ 56-58; Truluck Second Am. Compl. ¶¶ 46-47, 50.)  Plaintiffs Breeman, Custis, Truluck and Sahla, more specifically, allege that "approximately eight hours before the subject accident, another train crew reported to the defendants that the subject bridge had malfunctioned and failed to operate properly."  (Breeman First Am. Compl. ¶ 20; Custis Third Am. Compl. ¶ 59; Truluck Second Am. Compl ¶ 52.)  Nonetheless, the various complaints allege that "defendants caused and permitted the train to proceed across the bridge." (Morris Compl. ¶ 17; see also, e.g., Van Fossen Compl. ¶ 29; Breeman First Am. Compl. ¶¶ 28-29 and Custis Third

---

[4] Despite the allegation of joint and several ownership, Custis also alleges that the Paulsboro Bridge was "owned and operated by Defendant Conrail Corporation."  (Custis Third Am. Compl. ¶ 50.)  In addition, Custis alleges that "CSX Corporation" "operated" the train.  (Id.)  The Court notes that Custis has not sued CSX Corporation, but rather CSX Transportation, Inc.

Am. Compl. ¶ 68 (alleging that defendants' dispatcher authorized defendants' crew to travel across the Paulsboro Bridge).)  Custis, Truluck, and Sahla also allege negligence for failing to evacuate Paulsboro residents.  (Custis Third Am. Compl. ¶ 84(v); Truluck Second Am. Compl. ¶ 134(r).)

Defendants seek summary judgment on the following claims by each Plaintiff:

- Breeman: Negligence (Counts I and II), Punitive Damages (Count V), Nuisance (Count VI);[5]
- Custis: Negligence (Count I), Medical Monitoring (Count IV), Nuisance (Count V), Trespass (Count VI), and Punitive Damages (Count VII);[6]
- Truluck and Sahla: Medical Monitoring (Count I), Negligence (Count II), Nuisance (Count III), Punitive Damages (Count VI);[7]
- Van Fossen: Negligence (Count I), Gross Negligence (Count II);
- Morris: Negligence (Count I), Gross Negligence (Count II), Medical Monitoring (Count IV), Per Quod (Count V).[8]

The Court will discuss each cause of action in turn.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

---

[5] Defendants do not seek summary judgment as to Counts III and IV, relating to Breeman's minor children who are not involved in the bellwether trials.

[6] Defendants do not seek summary judgment on Counts II and III, relating to Custis's minor children.  CSX also does not join Norfolk Southern in seeking summary judgment as to Count VI.  However, Count VI, trespass, was dismissed with prejudice from Plaintiff's First Amended Complaint by this Court's Order dated November 4, 2013.  (See Civ. No. 12-7747, Doc. No. 50.)  Subsequently, plaintiffs in this matter amended their Complaint, and included the same claim for trespass.  (See Third Amended Complaint, Doc. No. 94.)  Because this count was previously dismissed with prejudice as to both Defendants and Conrail, the Court need not address this claim here.  Finally, summary judgment has been granted as to Plaintiff's medical monitoring claim in an Opinion and Order also issued on this date, so the Court will not address such claims in this Opinion.

[7] Defendants do not seek summary judgment as to Counts IV and V, relating to the claims of minors.  Additionally, summary judgment has been granted as to Plaintiff's medical monitoring claim in an Opinion and Order also issued on this date, so the Court will not address such claims in this Opinion.

[8] The Court previously dismissed Count III, alleging strict liability.  (See Civ. No. 13-3244, Doc. No. 16.)  Additionally, summary judgment has been granted as to Plaintiff's medical monitoring claim in an Opinion and Order also issued on this date, so the Court will not address such claims in this Opinion.

Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The substantive law governing the dispute will determine which facts are material, and only disputes over those facts 'that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  Oquendo v. Bettcher Indus., Inc., 939 F. Supp. 357, 361 (D.N.J. 1996) (quoting Anderson, 477 U.S. at 248).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  Corliss v.

Varner, 247 Fed. App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder, not the district court. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

### A.   Negligence

In New Jersey, the elements of a cause of action for negligence are: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty; (3) proximate cause; and (4) actual damages. Polzo v. Cnty. of Essex, 196 N.J. 569, 584 (2008). The plaintiff bears the burden of proving each of these elements in order to prevail. Furthermore, the determination of whether a duty of care exists is "quintessentially a question of law for the court." Highlands Ins. Co. v. Hobbs Grp., LLC, 373 F.3d 347, 351 (3d Cir. 2004). Both Defendants seek summary judgment on Plaintiffs' negligence claims.

#### 1.   Norfolk Southern

Norfolk Southern argues that summary judgment must be granted as to Plaintiffs' negligence claims because there is no evidence that it owed a duty to Plaintiffs. It also argues that it cannot be held vicariously liable for the acts or omissions of Conrail by virtue of its ownership interest in Conrail. This Court agrees.

While Plaintiffs allege that the Paulsboro Bridge and the train that derailed were "jointly and severally" owned, operated, managed, and controlled by Defendants, discovery has revealed

that these allegations have no factual basis.  Plaintiffs admit that the Paulsboro Bridge was a

Conrail bridge, that the train was operated by Conrail, and that Conrail employed the crew on

board.  The evidence Plaintiffs offer to attempt to establish a genuine issue of material fact are

essentially suspicions relating to a theory of vicarious liability.[9]  They present no evidence of any

independent act or omission on the part of Norfolk Southern that would subject it to direct

liability arising from the derailment, and therefore no facts suggest that Norfolk Southern owed a

duty of care to Plaintiffs.  "[Un]supported allegations in [the non-moving party's] memorandum

and pleadings are insufficient to repel summary judgment."  Schoch v. First Fidelity

Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).

Nor can Plaintiffs overcome summary judgment on its negligence claims on a theory of

vicarious liability or piercing of the corporate veil.  We begin from the premise that "[t]he

corporate form was created to allow shareholders to invest without incurring personal liability

for the acts of the corporation.  These principles are equally applicable when the shareholder is,

in fact, another corporation."  Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir.

2001).  The parent-subsidiary relationship is not enough to pierce the corporate veil.  Am. Bell

Inc. v. Fed'n of Tel. Workers of Pa., 736 F.2d 879, 887 (3d Cir. 1984).  However, "liability can

be imposed on a parent based on the actions of a subsidiary if the subsidiary is an 'alter ego' of

the parent."  MSA Prods., Inc. v. Nifty Home Prods., Inc., No. 11-5261, 2014 WL 197881, at *3

(D.N.J. Jan. 14, 2014).  This equitable remedy should be applied only under "extraordinary

circumstances."  Portfolio Fin. Servicing Co. v. Sharemax.com, Inc., 334 F. Supp. 2d 620, 627

(D.N.J. 2004).

---

[9] See below for discussion of vicarious liability.

Under New Jersey law, a plaintiff must prove the following two elements to prevail under a theory of piercing the corporate veil: "(1) one corporation is organized and operated as to make it a mere instrumentality of another corporation, and (2) the dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law." Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir. 2002) (citing Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 149 (3d Cir. 1988)).  As to the first element, the Third Circuit directs a court to consider the following factors: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) insolvency of debtor corporation; (5) siphoning of funds from the debtor corporation by the dominant stockholder; (6) nonfunctioning of officers and directors; (7) absence of corporate records; and (7) whether the corporation is merely a façade for the operations of the dominant stockholder.  Pearson, 247 F.3d at 484-85.  Even where a plaintiff can establish that the corporation is merely an alter ego under the first prong, liability may only be imposed where the dominant corporation uses the other company to commit a fraud or injustice, or to otherwise circumvent the law.  N.J. Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 501 (N.J. 1983).

Plaintiffs argue in their brief that Conrail is "a corporate puppet that does nothing more— indeed is prohibited from doing anything more—than facilitating the business undertakings of its parent companies."  Pls.' Opp'n Br. at 7.  But this is a bare conclusory allegation that will not defeat Norfolk Southern's motion.  See Celotex, 477 U.S. at 325.  Plaintiffs apparently arrive at this conclusion based on the testimony of Allen Richter, Conrail's Director of Hazardous Materials, that Conrail has "become basically an extension of CSX and [Norfolk Southern], almost like one of their divisions."  (Richter Dep. 48:2-8.)  Plaintiffs also rely on STB Decision No. 89, which states that Conrail will not perform transportation services directly, that it will not

contract with anyone other than CSX or Norfolk Southern, and that all transportation services it performs will be as agent or subcontractor of CSX or Norfolk Southern.  1998 WL 456510, at *17.  These statements in and of themselves do not create a genuine issue of material fact; rather it is Plaintiffs' underlinterpretation of these facts that they claim creates the dispute.  Plaintiffs have offered no proof of the inference that because Conrail does not perform transportation services directly and only contracts with Defendants, that it is therefore merely a façade for Norfolk Southern.[10]  Indeed, Norfolk Southern demonstrates that Conrail's primary purpose, as a switching and terminal railroad company, is to "connect larger carriers, and/or to own and operate terminal facilities," and not to "engage in transportation of freight as a line-haul carrier on behalf of shippers."  (Broder Supp. Aff. ¶ 3.)  It is undisputed that Defendants pay Conrail for the switching and terminal service it provides to them.

The only other factor Plaintiffs even attempt to address relates to Conrail's supposed undercapitalization.  They claim that Conrail has no assets, despite its declaration otherwise, citing to a single sentence in STB Decision No. 17 that says "Effective on June 1, 1999 . . . , the assets of Conrail were taken over by, and divided between, CSX and [Norfolk Southern]."  2004 WL 2619768, at *3.  However, Plaintiffs fail to note that in that same paragraph, the STB Decision states that Conrail's rail operating properties were divided into "Allocated Assets," to be operated either by CSX or Norfolk Southern alone, and "Retained Assets," which would be "retained and operated by a newly constituted Conrail, acting as a neutral switcher feeding traffic to both CSX and [Norfolk Southern]."  Id.  The statement Plaintiffs rely on does no more than

---

[10] The Court also notes that Conrail is not a wholly-owned subsidiary of Norfolk Southern, but rather Norfolk Southern jointly owns Conrail's stock along with CSX.  Plaintiffs therefore imply that Norfolk Southern and CSX colluded with each other to render Conrail merely an instrumentality of both shareholder companies.  Plaintiffs offer no evidence of this.

"simply show that there is some metaphysical doubt as to the material facts," which cannot sustain Plaintiff's burden of proof. Matsushita Elec. Indus. Co., 475 U.S. at 586.

Moreover, the fact that Norfolk Southern and/or CSX might assume the ultimate financial responsibility should Conrail be found liable does not bear on the issue of vicarious liability.[11] See The Mall at IV Grp. Props., LLC v. Roberts, No. 02-4692, 2005 WL 3338369, at *3 (D.N.J. Dec. 8, 2005) ("[T]here must be some 'wrong' beyond simply a judgment creditor's inability to collect."); see also Portfolio Fin. Servicing Co., 334 F. Supp. 2d at 627 (citations omitted) (noting that the extraordinary circumstances that merit a finding that the corporate veil has been pierced do not extend to a plaintiff's difficulty in enforcing a judgment, or undercapitalization that does not prevent the corporation from meeting the debts that arise in the normal course of business). The Third Circuit has clarified that the analysis of a corporation's capitalization is most useful as evidence of whether the corporation was established to defraud its creditors or for another improper purpose. Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 197 (3d Cir. 2003). There is no evidence to suggest undercapitalization at the time of Conrail's formation or at the time of the derailment, and no evidence of Conrail's intention to perpetrate a fraud or injustice.

---

[11] Plaintiffs come to the opposite conclusion based on two grounds. First, STB Decision No. 89 states that Defendants "will be responsible for all of the operating expenses and new liabilities attributable to the assets which they are operating." 1998 WL 456510, at *16. But it is undisputed that Conrail retained certain assets, including the Penns Grove Secondary Line and the Paulsboro Bridge, and thus this was not an asset that CSX or Norfolk Southern was operating. Accordingly, this statement does not support Plaintiffs' conclusion. Plaintiffs also claim that any award of damages against Conrail would be paid by Norfolk Southern and CSX in this case because the June 10, 1997 Transaction Agreement provides that "Environmental liabilities that do not relate predominantly to Allocated Assets shall be Corporate Level Liabilities," and that "It is the intent of the parties that the economic burden of the Corporate Level Liabilities will be borne, directly or indirectly, by CSX or [Norfolk Southern] in accordance with their respective Percentage." (Ex. J to Venti Cert., §§ 2.8(b)(iii), 4.3(b).) Even if this language did prove that Defendants are financially responsible for Conrail in this instance, a ruling that this Court declines to make, it does not matter because contrary to Plaintiff's suggestion, this fact would not show that Conrail's financial insulation from liability is being used by Norfolk Southern to "defeat the ends of justice, . . . to perpetrate fraud, to accomplish a crime, or otherwise to evade the law." N.J. Dep't of Envtl. Prot., 94 N.J. at 500 (citations omitted).

That a company is merely the alter ego of another must be shown by clear and convincing evidence.  Id. at 194 (quoting Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1522 (3d Cir. 1994)).  The conclusions that Plaintiffs present as to a limited number of factors fall far short of this standard.  Furthermore, Plaintiffs provide no proof of the second element relating to perpetrating a fraud or injustice, which is required to pierce the corporate veil.  Accordingly, Norfolk Southern's motion as to Plaintiffs' negligence claims will be granted.

### 2. CSX

CSX urges the Court to grant summary judgment in its favor on Plaintiffs' negligence claims because CSX did not own, operate, or otherwise manage the Paulsboro Bridge or the train that derailed, nor did it employ the crew involved in the derailment.  It also argues that CSX cannot be held vicariously liable for the acts or omissions of Conrail by virtue of its 50% ownership interest in Conrail.  Plaintiffs respond that CSX is liable to Plaintiffs for its own negligent acts.

On the night of November 29, 2012, around 11:00 P.M., a CSX train engineer heard the Paulsboro Bridge transmit an error message as the rear of his train was crossing pursuant to a green signal.  (Ex. F. to Venti Cert., NTSB Operations Report, p. 8).  The engineer did not report the failure message to the train dispatcher.  (Id.)  The crew on board the train that derailed the next morning was not aware that the Paulsboro Bridge had failed to operate the night before. (Ex. G to Venti Cert., Deposition of Mark Mather 83:9-14.)  On this basis, Plaintiffs argue that CSX is independently liable for negligence and summary judgment should be denied because this evidence presents a genuine dispute of material fact as to whether the derailment would have even occurred but for the CSX employee's failure to report the error message the night before the derailment.

A plaintiff may not raise new claims for the first time in opposition to a motion for summary judgment.  See Bell v. City of Philadelphia, 275 Fed. App'x 157, 160 (3d Cir. 2008). Likewise, this Court has held that a plaintiff may not expand his claim in opposition to a motion for summary judgment.  Carlson v. Twp. of Lower Alloways Creek, No. 06-3779, 2009 WL 2496523, at *4-5 (D.N.J. Aug. 12, 2009) (finding that plaintiff "impermissibly expand[ed]" his claims where his amended complaint alleged breach of contract based on two grounds, and he argued in his opposition to the defendant's motion for summary judgment that the contract had been breached based on two additional grounds); see also Diodato v. Wells Fargo Ins. Servs., USA, Inc., 44 F. Supp. 3d 541, 556-57 (M.D. Pa. 2014) (finding that plaintiff attempted to improperly amend his complaint in his brief in opposition to a motion for summary judgment by articulating new factual allegations in relation to his breach of contract cause of action); Duran v. Merline, 923 F. Supp. 2d 702, 723 (D.N.J. 2013) (noting that two instances of misconduct raised for the first time in plaintiff's opposition brief relating to his access to courts claim should not be considered).

Plaintiffs' argument that CSX is liable because of its omission the night before the derailment is not properly before the Court.  Plaintiffs' allegations of negligence in their complaints as to CSX (and the other defendants) arise from the defendants' joint ownership, operation, and management of the Paulsboro Bridge and the train that derailed.  The complaints allege that all defendants, including Conrail, knew that the Bridge had malfunctioned numerous times in the past.  In fact, three of the complaints allege that just eight hours before the derailment, "another train crew reported to the defendants that the subject bridge had malfunctioned and failed to operate properly."  (Breeman First Am. Compl. ¶ 20; Custis Third Am. Compl. ¶ 59; Truluck Second Am. Compl ¶ 52.) (emphasis added).  Thus their theory of

negligence appears to stem from Conrail's knowledge that the Paulsboro Bridge had a history of malfunctioning, as recently as the evening before the derailment, and that proceeding across the Bridge in the face of this knowledge was negligent.  This knowledge of the pervious malfunction is the opposite theory that Plaintiffs are now attempting to raise in opposition to CSX's motion.

Furthermore, even if the Court were to consider these allegations against CSX on the merits, they would still fail because no reasonable jury could conclude that CSX caused the derailment.  Even if CSX owed a duty of care to Plaintiffs despite the overwhelming evidence that it did not own or operate the Paulsboro Bridge or train, and even if CSX breached that duty by not reporting the failure message to the dispatcher on the night preceding the derailment, summary judgment would be appropriate because CSX's omissions were not the proximate cause of the derailment.

Plaintiffs conclude that "there is a reasonable probability that, had the November 29, 2012 Bridge malfunction been disclosed by the CSX train engineer, the Conrail crew would not have endeavored to cross the Bridge on November 30, 2012."  Breeman Opp'n Br. at 5.  But, as Defendants point out, Conrail already knew that the Paulsboro Bridge was not functioning properly on the morning of the derailment because the Bridge announced a malfunction.  The audio transmissions between the train's conductor and dispatcher reveal the Paulsboro Bridge's message that the Bridge "failed to operate," as well as the engineer's acknowledgement of that message to the dispatcher.  (Ex. B to the Declaration of Chad Clamage, Deposition of Jon A. Havlicek 149:15-20.)  These communications took place before the dispatcher gave the crew permission to cross despite the red signal.  (Id. at 150:4-5.)  The Conrail crew thus knew about the malfunction before the train crossed the Paulsboro Bridge, and the information was relayed to the dispatcher prior to making the decision to cross.  No reasonable jury would conclude that

the evidence that CSX did not report a failure message the night before the derailment is the proximate cause of Conrail's decision to proceed across the Paulsboro Bridge with cars full of hazardous materials despite a red signal and a failure message.  See In re CitX Corp., 448 F.3d 672, 677 (3d Cir. 2006) (the non-movant "must present sufficient evidence to allow a reasonable jury to find in his favor.").  Thus, Plaintiffs' negligence claims against CSX fail as a matter of law.

Finally, to the extent that Plaintiffs argue that CSX can be vicariously liable for the torts of Conrail, that argument fails for the same reason that the Court was not convinced of Norfolk Southern's vicarious liability.  See supra, Section III(A)(1).

### B.  Gross Negligence

As discussed supra, there is no evidence of Defendants' negligent conduct, and they cannot be held vicariously liable to Plaintiffs.  Gross negligence is a more exacting standard that requires a plaintiff to establish that the defendant's actions constituted "an extreme departure from the ordinary standard of care."  Marangos v. Flarion Techs., Inc., No. 05-4919, 2007 WL 1302991, at *12 (D.N.J. May 1, 2007) (quoting Swisscraft Novelty Co. v. Alad Realty Corp., 113 N.J. Super. 416, 426 (App. Div. 1971)).  Accordingly, Defendants are necessarily entitled to summary judgment as to Plaintiffs' claims for gross negligence.

### C.  Nuisance

Plaintiffs' claims for nuisance against Defendants cannot succeed for the same reasons that Plaintiffs' claims for negligence fail.  There are two elements to a private nuisance claim: "1) unreasonable use by the defendant and 2) significant harm to the plaintiff."  Rose v. E.I. Dupont De Nemours and Co., 262 F.R.D. 451, 459 (D.N.J. 2009).  Defendants are liable for nuisance only if their "conduct is a legal cause of an invasion of another's interest in the private

use and enjoyment of land, and the invasion is either intentional and unreasonable, or unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities."  S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot., No. 01-702, 2006 WL 1097498, at *16 (D.N.J. Mar. 31, 2006) (citing Restatement (Second) Torts § 822 (1979)).  There is no allegation here of an intentional invasion or that Defendants engaged in any abnormally dangerous activities or conditions.  Moreover, as discussed in Section III(A), supra, there is no evidence that Defendants are the legal cause of any harm resulting from the derailment and subsequent release of chemicals that supposedly invaded  Plaintiffs' properties.  Summary judgment must be granted to Defendants on these claims.

### D.  Per Quod

Plaintiff Pickel's derivative claim for loss of consortium as the spouse of Plaintiff Morris cannot survive because summary judgment will be granted on Morris's direct causes of action. "A per quod claim can rise no higher than the spouse's underlying cause of action for injury." Murphy v. Hous. Auth. and Urban Redevelopment Agency of City of Atlantic City, 32 F. Supp. 2d 753, 769 (D.N.J. 1999) (internal quotations omitted); see also McDougald v. Franklin Twp., No. 12-3423, 2014 WL 1744772, at *7 (Apr. 30, 2014) ("[B]ecause Plaintiffs' claims cannot survive summary judgment, [plaintiff's] derivative loss of consortium claim cannot either."). Therefore, summary judgment is granted as to Count V of Morris and Pickel's Complaint.[12]

### E.  Punitive Damages

Plaintiffs argue that because Conrail's acts are all inherently authorized by its parent corporations, punitive damages can be awarded against them.  Punitive damages is a remedy, not

---

[12] Summary judgment is granted only as to Pickel's per quod claim against Defendants CSX and Norfolk Southern. The claim still remains as to Defendant Conrail.

a cause of action.  See Smith v. Whitaker, 160 N.J. 221, 235 (1999) ("As a rule, a claim for

punitive damages may lie only where there is a valid underlying cause of action."); see also

Lauria v. Mandalay Corp., No. 07-817, 2008 WL 3887608, at *3 n.1 (D.N.J. Aug. 18, 2008).

Because the Court grants summary judgment as to the underlying causes of action, Plaintiffs'

claims for punitive damages must also fail.[13]

## IV.    CONCLUSION

For the foregoing reasons, Norfolk Southern's motion for summary judgment will be

**GRANTED**.  CSX's motions for summary judgment will also be **GRANTED**.  An appropriate

Order shall issue.


Dated: 8/18/2015                                        s/ Robert B. Kugler
                                                        ROBERT B. KUGLER
                                                        United States District Judge

---

[13] Summary judgment is granted on Plaintiffs' punitive damages claims as to Defendants CSX and Norfolk Southern only.